**Ex parte Ricky Nolen McGINN, Applicant.**

**No. 35570–04.**

Court of Criminal Appeals of Texas. En Banc.

June 14, 2000.

Richard Alley, Forth Worth, for appellant.

Lee Haney, DA, Brownwood, for the State.

McCORMICK, P.J., delivered a concurring opinion, in which KELLER and KEASLER, JJ., joined.

This applicant's 11th-hour third habeas corpus application is an abuse of the writ and has been filed for purposes of delay. Applicant's current writ contains a claim that could have and should have been raised in applicant's initial habeas corpus application. I, therefore, concur in the Court's decision to dismiss applicant's third habeas corpus application.

In 1995 applicant, who at the time of this offense had sexually assaulted two women and his own three or four-year-old daughter, was convicted of the 1993 capital murder of his 12–year–old step-daughter. The evidence from the 1995 trial shows the following. Applicant murdered the victim while committing an aggravated sexual assault of her. Applicant killed the victim by hitting her several times in the head with an ax.

The evidence from trial also shows the following. The victim's mother went out of town and left applicant and the victim alone together at their home. Applicant and the victim were alone together the entire day and applicant was the last one to see the victim alive.

Later that night applicant called the sheriff's department and reported the victim missing. This occurred two to three hours after applicant claimed he realized the victim was missing. Applicant told the police that the victim went for a walk earlier that afternoon and that she never returned home. Police, friends and relatives searched the area during the night but did not find the victim.

More volunteers along with several dogs arrived the next morning to search for the victim. One of these dogs was trained to alert to the scent of a cadaver. This dog alerted to the back of one of applicant's cars which led the police to search the car.

The police found blood in various places in the car. Applicant explained that this was fish blood from when he and the victim went fishing in a stock tank the previous afternoon. Applicant claimed that he and the victim caught several fish which they threw in the back of the car. At trial,

the prosecution claimed that applicant's fish story was preposterous. The police apparently did not believe applicant's fish story either since they arrested applicant soon after the discovery of the blood in applicant's car.

The blood in applicant's car turned out to be human and not fish blood. Applicant has Type O blood. The victim had Type A blood. The blood found in applicant's car was Type A blood and, therefore, could not have belonged to applicant. Further testing of the blood established that it was consistent with the victim's blood and it excluded 96.4 to 99.99 percent of the rest of the population as possible donors of the blood. DNA typing of this blood was not possible. Hair found in one of the blood stains in applicant's car also had the same microscopic characteristics as the victim's hair.

The police found the victim's body inside a metal culvert three days after she disappeared. She had been struck several times in the head with an ax. There also was evidence of sexual activity.

The next day the police found an ax in a non-working pickup truck that belonged to applicant. This pickup truck also was located on the property where the victim was last seen alive. Enzyme testing and PCR DNA analysis of the blood on the ax indicated a strong probability that this blood was the victim's. Hair found in the blood on the ax also had the same microscopic characteristics as the victim's hair.

The prosecution presented other blood evidence from applicant's shoes and clothes all of which pointed to applicant's guilt. The prosecution presented other evidence that, when considered in its totality with the other evidence and not individually or in a vacuum, pointed to applicant's guilt.

A semen stain was also found on the victim's shorts and in swabs taken from her vagina during the autopsy. A pubic hair was also recovered from her vagina. The pubic hair had the same microscopic characteristics as applicant's pubic hair. At the time of trial DNA analysis by the prosecution and the defense of the pubic hair and the semen was inconclusive except to establish that applicant was not excluded as a possible donor of the semen.

The semen and pubic hair evidence are the subjects of this, applicant's third, habeas corpus application. In this application applicant claims for the first time that "mitochondrial and STR DNA testing" of the semen and pubic hair evidence could provide "conclusive proof of his guilt or innocence."[1] Applicant also claims that this "mitochondrial and STR DNA testing" is new DNA technology that was developed since the time of his trial. Applicant, therefore, argues that he meets the Section 5(a)(1) exception to the Section 5(a) procedural bar because the factual basis of his claim (i.e., the new DNA technology) "could not have been presented previously in [his] initial [habeas corpus] application." See Article 11.071, Section 5(a)(1), V.A.C.C.P, and Applicant's Memorandum In Support Of Habeas Corpus Relief at 19–20.

But the record from the May 2000 hearing on applicant's third habeas corpus application reflects that this "new" DNA technology has existed since at least 1996.[2]

---

1. It should be noted that these DNA tests even if favorable to applicant would clear him of sexually assaulting the victim but not of murdering her.

2. The prosecution made the following uncontroverted argument during the May 2000 hearing on applicant's third habeas corpus application.

   "But, now, these changes in technology that are spoken of in the affidavit, are really not

Applicant filed his initial habeas corpus application in September 1997. The factual basis of the claim in applicant's third habeas corpus application was, therefore, available to applicant when he filed his initial habeas corpus application. Applicant does not meet the Section 5(a)(1) exception.[3]

It also should be remembered that the Legislature added Article 11.071 in 1995 to prevent capital inmates from abusing the writ of habeas corpus like the applicant is doing here. See *Ex parte Davis*, 947 S.W.2d 216, 226–27 (Tex.Cr.App.1996) (McCormick, P.,J., concurring) (Article 11.071 is essentially a legislative codification of judicially created "abuse of the writ doctrine"). Applicant did not raise his "new" DNA technology claim in his initial habeas corpus application even though the claim was available.[4] Applicant also did not raise this precise claim in his second habeas corpus application which this Court unanimously dismissed as an abuse of the writ in March 2000.[5] Applicant did not raise his "new" DNA technology claim until this 11th-hour third habeas corpus application less than two weeks before his

that new. The F.B.I. lab was doing mitochondrial D.N.A. work on a forensic basis in 1996. The S.T.R. extraction method was being used in 1996 in various laboratories and cases that already reached the appellate courts in Massachusetts in 1998. So, although it is technology that has developed since the date of trial, to some extent, it's not technology that developed last week, last month, last year. It's stuff that has been ongoing."

The affidavits filed in support of applicant's third habeas corpus application do not contradict this as they refer to "DNA technology developed since the time of applicant's trial." But the relevant date is the date of applicant's initial habeas corpus application. See Article 11.071, Section 5(a)(1).

The habeas court's findings also do not contradict the prosecution's assertion that the "new" DNA technology has existed since at least 1996. And, even if they did, there would be no evidence to support them since the only evidence applicant relies on is the "new" DNA technology that has been developed "since the time of applicant's trial." This, however, does not establish or support a finding that this "new" DNA technology was unavailable when applicant filed his initial habeas corpus application in 1997. To the extent the habeas court may have found to the contrary, the record does not support this finding. This is fatal to applicant's claim that he meets a Section 5(a)(1) exception since it is his burden to establish the exception.

3. Judge Price's dissenting opinion and the habeas court apparently would decide that applicant meets the Section 5(a)(1) exception because when applicant filed his previous two habeas corpus applications "there was no expert who had stated what Dr. Giles stated in his affidavit of April 20, 2000." This, however, is irrelevant.

The issue is not whether applicant could previously have found an expert to state what Giles eventually stated in his 11th-hour affidavit. The issue is whether the factual basis of applicant's current claim was available when applicant filed his initial habeas corpus application. See Article 11.071, Section 5(a)(1).

Here, the factual basis of applicant's current claim is "new" DNA technology. But, this technology was available when applicant filed his initial habeas corpus application in 1997. The habeas court, therefore, misapplied the law set out in the Section 5(a)(1) exception to conclude that applicant's current claim meets that exception.

4. This Court considered the merits of the claims set out in applicant's first habeas corpus application and unanimously denied habeas corpus relief in July 1998.

5. Applicant filed his second habeas corpus application in February 2000. In this application, applicant requested DNA retesting of most of the evidence including the pubic hair and semen evidence. This habeas corpus application did not mention anything about any "new" DNA technology. Rather, this habeas corpus application contained misrepresentations about the lack of independent defense DNA experts for applicant's 1995 trial. The record, however, reflects that the taxpayers provided applicant with these experts for his 1995 trial.

scheduled June 1, 2000, execution date even though the basis of the claim had been available for about four years.

And, during the May 2000 hearing on applicant's third habeas corpus application, the prosecution claimed that applicant's 11th-hour third habeas corpus application was filed solely for purposes of delay.

"Then, there was expert testimony that the [pubic] hair that was recovered exhibited the exact same identical microscopic characteristics as those of [applicant]. The jury obviously found that evidence compelling in determining that that was indeed [applicant's] pubic hair. So, now, at the—in the last few minutes of the 11th hour, [applicant] approaches this court to have this evidence re-tested. And as the Court can tell from looking at the record in this case, we're talking about two exhibits out of 169 exhibits that were presented in this trial that established his guilt. For that reason, the State assures the Court that clearly this motion is brought for the immediate purpose of delay. We're here on the eve of the execution talking about matters that could well have been presented on many occasions in the past, matters that are presently pending in the 5th Circuit and before the Board of Pardons and Paroles." [6]

In addition, applicant essentially claims that the "new" DNA technology could clear him of the sexual assault but not clear him of the murder. So what it all comes down to is that at best the "new" DNA technology could establish that someone else sexually assaulted the victim and applicant then murdered her. At the May 2000 hearing on applicant's third habeas corpus application, applicant argued:

"In other words, D.N.A. can exonerate a person to within a 99.5 percent accuracy or establish his guilt of a crime to that same degree, according to the information I've seen, in addition to published reports, even as late as last night. The point being that that being the case, we have an inconclusive on two vital pieces of evidence. The reason I say they are vital is this: This is a capital murder based upon an allegation of sexual assault. Both of the pieces of evidence I focused on, one is a pubic hair found within the vaginal cavity of the victim. Obviously, it's not hers. It would have to have been donated by the person who committed the sexual assault.

"With respect to the alleged semen stain in the shorts of the victim, once again, that was evidence which was presented and argued to the jury as being evidence of a sexual assault. If there were no sexual assault in this case, then, there would not be the aggravating factor to elevate the murder to a capital murder. In essence, if testing were done on these two pieces of evidence which were determined to be inconclusive originally, if they were conclusively found in my client's favor, it would exonerate him from the aggravating factor to make this capital murder, and therefore, he would become ineligible not only for the conviction of capital murder, in other words,

---

**6.** The habeas court also was "disconcerted" about the "late filing" of applicant's third habeas corpus application.

"My problem is, I want to give you a full, fair and open forum to present it to me, hear everything you've got, and then the same thing for the State, and then rule on this matter. Certainly right now this is a very important matter, we're here—I am a bit disconcerted that this was filed just last week and this man's execution date is the first of June, which is obviously next week. And I'm not particularly happy with what I view as the late filing in all of this, but I also understand that these are complicated things and there is a lot of things that are at stake here."

be actually and factually innocent, but he would also be ineligible for the death penalty since the only way you can get it is to be convicted of capital murder in addition to having the two or three special issues, as the case may be depending on the time frame as the Court is well aware of the jury. Those are matters that I think are extremely important.

"Now, I'm mindful of the fact that a court, including this court, has got to look at the totality of all of the evidence in making the determination of actual and factual innocence. However, it would be our position that the two bits of evidence that focused most directly on this are the two that I focused on. There is no doubt that there was blood evidence on the vehicle that was recovered. There was blood evidence on the axe. There was other blood evidence on clothing and other matters that were tested, and of course, that has to be taken into account with everything else, but all they go to is establishing a murder. They do not establish in and of themselves a capital murder."

\* \* \* \* \* \* \* \*

"Now, the two exhibits we talked about go specifically to the question of the Sexual Assault by [applicant] which is the next issue I want to take up with the State. I'm not saying that [the victim] was not sexually assaulted. I only represent [applicant]. [Applicant] was convicted of a murder in the course of her sexual assault, and therefore, I am directing and have directed each and every of my arguments to the fact that the evidence in this case of sexual assault by [applicant] essentially comes down to those two exhibits when you look at that issue, so to speak, in a vacuum. Although I know the Court can't, but when

looking at the issue of sexual assault, those are, of course, the most evocative arguments."

A fair and objective reading of all the relevant materials in this case clearly indicates that applicant is abusing the Great Writ. Applicant has received all the process that any civilized society can be expected to provide him. Cf. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 338, 102 L.Ed.2d 281 (1988) (in investigation of sexual assault of ten-year-old-boy, police failure to test semen samples with newer test device did not violate due process). Legitimate finality concerns as well as legitimate concerns for the twelve-year-old victim, her family and society should prevail here. This case brings to mind the following passage from a treatise on due process of law:

"It has become the fashion recently to speak as though the Constitution were devoted solely to the rights of the accused. But what are those rights? They are, first of all, the rights granted by the constitution and laws of the United States and of the states. Fundamentally, the accused has but one right by nature and that is the right to such rights as will inure justice. Within the current fashion, it often appears that justice is nothing more than tender mercy for the accused—for the 'underdog' against whom the powerful forces of governmental prosecution have been brought to bear. Surely a harsh and cold disregard for the accused is not a hallmark of justice, but it must not be forgotten that justice is also concerned with the elderly widow who was strangled with malice aforethought and for the peace of the community which that strangulation breached. Nor can we forget what the first count of the information upon which Appellant was tried reminds us of, that that elderly widow

was a 'human being'; nor what the instruction to the jury reminds us of, that malice aforethought involves an 'abandoned and malignant heart.' While passion for retribution must not be allowed to convict a man unfairly, neither should sympathy for the weaker side in a trial cause us to find injustice where it does not lie. Mercy is a civilized component of, but it is not a surrogate for justice."[7]

Echoing these concerns, the prosecution argued at the May 2000 hearing on applicant's third habeas corpus application:

"May it please the Court. Stephanie Flanary, the victim in this case, has been in her grave for over seven years. And it was about five years ago next month that a jury of twelve very carefully and fairly selected men and women from Brown County heard all the evidence in this case and determined that [applicant] was guilty of capital murder, determined unanimously and beyond a reasonable doubt. They further determined he would be a continuing threat to society and found that there were no mitigating circumstances that would call for him to receive life imprisonment rather than the death penalty. Since that time, over two dozen judges in Brownwood and Lubbock and Austin and New Orleans and Washington D.C., in some cases on two or three occasions, have considered the evidence in this case on direct appeal, state habeas and federal habeas proceedings, and in each case, they have upheld the decision that was made in this courtroom."

With these comments, I concur to the dismissal of applicant's third habeas corpus application as an abuse of the writ.[8]

KELLER and KEASLER, JJ., join this concurrence.

WOMACK, J., filed a concurring opinion, joined by KELLER and JOHNSON, JJ.

On June 7, 1995, the applicant was sentenced to death for a murder that was committed in the course of an aggravated sexual assault of the victim on May 22, 1993. On appeal this Court affirmed the judgment and sentence.[1]

On September 8, 1997, the applicant filed his first application for the writ of habeas corpus, seeking relief from the judgment of conviction. He presented eight points that raised constitutional issues about the trial procedures, including ineffective assistance of counsel for failing to call certain witnesses at the punishment stage. On May 8, 1998, the district court entered findings of fact and conclusions of law, and the application was sent to this Court. We adopted the trial court's findings and conclusions, and we denied habeas corpus relief on July 8, 1998.[2]

The applicant sought, and was denied, habeas corpus relief in federal courts.[3]

---

7. Richard G. Stevens, *Frankfurter and Due Process* (1987) at 203–04.

8. The Governor exercising his executive power to grant applicant a 30 day delay of his execution in no way undermines our decision to dismiss applicant's current habeas corpus application as an abuse of the writ. The Governor has the power, authority and discretion to grant such a delay. Article 11.071 grants this Court no such power and authority. See *Davis*, 947 S.W.2d at 224 (McCormick, P.J., concurring) (Article 11.071 contains exclusive procedures for exercise of this Court's original habeas corpus jurisdiction in death penalty cases).

1. *See McGinn v. State*, 961 S.W.2d 161 (Tex. Cr.App.).

2. *Ex parte McGinn*, No. 37,750–01 (Tex.Cr. App. July 8, 1998) (not designated for publication).

3. *McGinn v. Johnson*, No. 6:98–CV–073–C (N.D.Tex.Jan.20, 1999), *aff'd.*, 199 F.3d 440 (5th Cir.1999) (opinion not published), *cert.*

On February 25, 2000, the applicant filed his second application for writ of habeas corpus in the convicting court. This application contained two points challenging the trial court's judgment and two points about this Court's procedure on appeal. We dismissed this application on March 29, 2000.[4]

The convicting court entered an order setting the date of execution at April 27. Later the court accommodated the applicant's counsel by resetting the date of execution at June 1.

On or about May 15, 2000, the applicant filed in the convicting court a "Defendant's Motion to Authorize Retesting of Physical Evidence by Defense DNA Expert." This motion alleged that "a motion for habeas corpus relief [was] pending in the United States Court of Appeals for the Fifth Circuit. That petition asserts that if retested the physical evidence which was tested by DNA experts in this case previously yielding an inconclusive result because of new technology and other circumstances would yield more positive results and remove any doubt as to the correctness of the guilt and death penalty verdicts of the jury herein which the Defendant has called into question in his federal habeas corpus petition." The motion prayed for "the relief requested in this motion"; there was no request for relief other than that in the title of the

motion. The convicting court heard the motion on May 23, 2000.

At the hearing, the State "question[ed] … what legal authority there is for the court to do re-testing at this stage of the proceedings, and whether the court should defer any questions such as this to the Fifth Circuit and the Board of Pardons and Paroles, both of which are considering this very issue at this very time." The applicant confirmed that he was seeking re-testing before those entities. On May 25, the district court ruled that it would treat the motion as a subsequent application for writ of habeas corpus. It made findings of fact and conclusions of law, and the district clerk has transmitted the record to this Court. Thereafter, the applicant has treated the motion in the same fashion.[5] So has this Court, and I know of no other available procedure.

The Texas Constitution makes this Court's power to issue the writ of habeas corpus subject to regulation by statutes.[6] In 1995, Article 11.071 of the Code of Criminal Procedure was enacted to regulate the power of this Court to issue "a writ of habeas corpus in which the applicant seeks relief from a judgment imposing a penalty of death."[7] That statute forbids any court of this state to consider a second or subsequent application unless the application establishes one of three findings.

---

*denied,* 528 U.S. 1163, 120 S.Ct. 1179, 145 L.Ed.2d 1086 (2000).

**4.** *Ex parte McGinn,* No. 37,750–03 (Tex.Cr. App. March 29, 2000) (not designated for publication).

**5.** On May 26, he filed a "Memorandum of Law in Support of Subsequent Application," a term that is used in the habeas corpus statute, as is explained below.

**6.** "Subject to such regulations as may be prescribed by law, the Court of Criminal Appeals and the Judges thereof shall have the power to issue the writ of habeas corpus, and, in criminal law matters, the writs of mandamus, procedendo, prohibition, and certiorari." Tex. Const. art. V, § 5.

**7.** Tex.Code Crim. Proc. art. 11.071, § 1. The statute does not violate the separation of powers provision or the open-courts provision of the state constitution, nor suspend habeas corpus, nor deny equal protection or due process or due course of the law, nor deny the constitutional rights to counsel. *Ex parte Davis,* 947 S.W.2d 216 (Tex.Cr.App.1996).

If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.[8]

The statute specifies, "If the court of criminal appeals determines that the requirements have not been satisfied, the court shall issue an order dismissing the application as an abuse of the writ under this section."[9] The question, then, is whether the application contains sufficient specific facts establishing one of the three requirements.[10]

The application that is now before us does not satisfy the first requirement for an exception to the bar against subsequent applications because it does not contain sufficient specific facts establishing that the claim could not have been presented timely in the initial application, which was filed on September 8, 1997.

The "motion" that has been treated as an application is completely silent on this point. The applicant introduced in evidence an affidavit, dated April 20, 2000, from the Science Director of a DNA-testing laboratory that had done work for the defense at trial. The affidavit says that "technological advances [have been] made since the original tests were performed," and that there have been "recent advances in DNA testing" and "newer methods." The affidavit also said that it would be more than reasonable to allow the applicant an opportunity to prove his claim of innocence by new DNA tests. No other evidence was introduced on this point. The applicant also has filed with this Court a brief, to which is attached an affidavit from a law professor, who is of counsel to the applicant. The affidavit says, "Since the conviction in this matter" a new technique of testing DNA is being used, and, "Since the time of this trial" another new technique has been developed.

But the question that the statute requires us to ask is not what has happened since the time of the original testing or what has happened since the trial in 1995.

---

**8.** Tex.Code Crim. Proc. art. 11.071, § 5(a). A "factual basis for a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable by the exercise of reasonable diligence on or before that date." *Id.* § 5(e).

**9.** *Id.* § 5(c).

**10.** The dissenting opinion says that the writ is not barred by the statute because the application "contains sufficient facts to distinguish it from his previous claims." *Post* at 3. A subsequent application does not meet the requirements of the statute merely because it presents a different claim. Section 5 of the statute is meant to prevent applicants from presenting different claims in a subsequent application unless they could not have been presented in the initial application.

The mandatory question is whether this subsequent application contains specific facts establishing that the current claim could not have been presented in the initial application because the factual basis of the claim was unavailable on the date the applicant filed the initial application: September 8, 1997. The present motion completely and conspicuously fails to contain any such fact.

This Court cannot find that the applicant failed to meet this requirement because he was ignorant of it or because it was not an issue at the hearing. The applicant's counsel specifically told the district court that he was trying to meet a similar requirement in the federal courts.[11] And the State argued that the tests the applicant sought were available before 1997.[12]

The district court found that the factual basis for the claim was unavailable on the date the applicant filed his initial application. The finding was "based upon the arguments of Defendant's attorney at the hearing ... in that there was no expert who had stated what [the Science Director of the DNA testing laboratory] stated in his affidavit of April 20, 2000." This finding is not supported by the record.

The district court's finding evidently refers to counsel's request for permission to supplement the record with other affidavits. He said that he had "been in contact with a number of experts over the course of several weeks and months, attempting to get additional proofs from them." The court asked what counsel hoped to prove with additional affidavits. Counsel said that the office of "Dr. Blake, who is a D.N.A. expert out in California," said it would send "an affidavit that would be very similar to that offered by [the Science Director whose affidavit was in evidence] as regards to the efficacy of re-testing D.N.A. in light of the advances." Counsel also said that he had been offered an affidavit from the law professor, which has in fact come to this Court. Counsel said these affidavits would essentially corroborate the affidavit that was in evidence, as to the amount of time needed for testing

---

**11.** A similar statute governs federal habeas corpus applications for relief from state judgments:

> A claim presented in a second or successive application ... that was not presented in a prior application shall be dismissed unless—
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). An order from a court of appeals must be obtained before a second or successive application is filed in the district court. *Id.* § 2244(b)(3)(A). In the convicting court, counsel for the applicant referred to the application of section 2244 to the proceedings he had brought in the federal court of appeals.

**12.** The district attorney told the district court, "But, now, these changes in technology that are spoken of in the affidavit, or the various affidavits, are really not that new. The F.B.I. lab was doing mitochondrial D.N.A. work [one of the methods of testing being sought] on a forensic basis in 1996. The S.T.R. extraction method [the other method] was being used in 1996 in various laboratories and cases that already reached the appellate courts in Massachusetts in 1998. So, although it is technology that has developed since the date of the trial, to some extent, it's not technology that developed last week, last month, last year. It's stuff that has been ongoing." The applicant did not reply to this argument.

and the "desirability of re-testing in light of the type of case this is."

Even if this Court could accept the arguments of counsel as a substitute for the specific facts that the statute requires to be contained in the application, counsel's argument stated nothing relevant. To begin with, counsel's inability to find an expert who had stated what the applicant's expert stated in his affidavit of April 20, 2000 in no way proves the unavailability of the "newer" methods of DNA testing on September 8, 1997. The affidavits from the Science Director and the law professor provided no proof of unavailability on the date of the initial filing, and more similar affidavits would provide no more support for the finding of unavailability.

The district court also found, "Frankly, it is questionable as to whether or not this factual basis could have been ascertainable through the exercise of reasonable diligence on or before May 15, 2000, which is the date that the Defendant filed his Motion to Authorize Retesting of Physical Evidence." The affidavits and the arguments on which the district court relied provide no support for this finding. And in any event such a finding could not authorize this Court to consider this application. What the statute requires is not that the availability of facts be "questionable." It requires that the application contain specific facts establishing that the current claim could not have been presented previously in a timely initial application because the factual basis for the claim was unavailable.

The only other finding that might satisfy the requirements of article 11.071 is that the application contain specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.[13] If it is assumed that such a claim involves a violation of the Constitution that is amenable to the writ of habeas corpus,[14] the application does not contain specific facts establishing innocence. The applicant's position at the hearing was that, because the murder was a capital offense only because he committed it during the course of committing a sexual assault on the victim, if he is innocent of the sexual assault on the victim he would be innocent of capital murder (though guilty of murder). The only fact that this application establishes is the possibility that, if the applicant is truthful about being innocent of the sexual assault, further DNA testing would produce evidence of his innocence. This does not meet the requirement of the statute. The statute could authorize a subsequent habeas corpus application for the purpose of gaining time to get evidence, but it does not.

Our oaths are to uphold the constitutions and laws of this country and state; they are not a commission to do what a majority of us think is fair. This law was passed by the legislature and approved by the governor, in accordance with our constitutional form of government. The law is clear: this court shall dismiss this application because it was filed late. If the law is barbarous, the legislature should repeal it or the governor should commute or pardon those who are subjected to it. In the mean-

**13.** *See* Tex.Code Crim. Proc. art. 11.071, § 5(a)(2). The third statutory exception, *see id.* § 5(a)(3), involves only applications that seek relief from the punishment rather than the conviction.

**14.** *See Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

time, we must follow it.[15]

Article 11.071, section 5, leaves this Court no authority to do anything other than dismiss this application as an abuse of the writ.

PRICE, J., delivered an opinion dissenting to the order dismissing applicant's writ of habeas corpus.

Today, the majority dismisses applicant's writ of habeas corpus on the grounds that it is procedurally barred pursuant to Texas Code of Criminal Procedure Article 11.071 § 5(a). *See* TEX.CODE. CRIM. PROC. Art. 11.071 § 5(a) (court cannot consider merits or grant relief based on subsequent application unless current claims and issues were not and could not have been previously presented). I write separately to explain my disagreement.

In applicant's previous writ of habeas corpus, he submitted:

> In this case the defense did not ask for its own expert to conduct or even to observe the testing done herein by the State with respect to blood testing, typing and DNA. Independent DNA analysis of the existing evidence will establish by a preponderance of the evidence that the Applicant is both factually and actually innocent of capital murder herein.

This Court dismissed applicant's third writ on March 29, 2000. We received applicant's current writ on May 26, 2000. In the current writ, applicant requests authorization for retesting of physical evidence by a defense DNA expert, based upon the affidavit of Dr. Robert C. Giles. Applicant argues:

> New DNA testing is now available which could provide conclusive proof of [applicant's] steadfast contentions. Specifically, Applicant seeks to test biological evidence to wit, a pubic hair found in the victim's vagina, and a semen stain

The district court that heard applicant's present writ agreed with applicant and recommended that relief be granted. It stated:

> [Applicant] asserts claims and issues which the Court finds have not been and (based upon the arguments of Defendant's attorney at the hearing) could not have been presented previously in the initial hearing filed under Art. 11.071 of the *Texas Code of Criminal Procedure* because the factual basis for the claim was unavailable on the date the Defendant filed his previous two (2) applications for Writ of Habeas Corpus in that there was no expert who had stated what Dr. Giles stated in his affidavit of April 20, 2000. Frankly, it is questionable as to whether or not this factual basis could have been ascertainable through the exercise of reasonable diligence on or before May 15, 2000 which is the date that the Defendant filed his Motion to Authorize Retesting of Physical Evidence.... [In the previous writ t]here was no mention of advancements in DNA technology, no request to retest specific items of evidence and in fact misstatements earlier in the same paragraph about the lack of defense experts and independent DNA analysis at trial.

I agree with the findings of the trial court. Thus, this writ should not be barred under section 5; it contains sufficient facts to distinguish it

Pursuant to the trial court's recommendation, I would grant applicant's request for a stay of execution and authorize further DNA testing.

---

15. *Ex parte Smith,* 977 S.W.2d 610, 611 (Tex. Cr.App.1998).